# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW MEXICO

SANYA KAY MILNER,

     Plaintiff,

v.                                          Civ. No. 16-1050 GJF

NANCY BERRYHILL, *Acting Commissioner of the Social Security Administration*,

     Defendant.

## ORDER

THIS MATTER is before the Court on Plaintiff Sanya Milner's ("Plaintiff's") "Motion and Memorandum in Support of Reversing and Remanding Administrative Agency Decision" ("Motion"), filed on March 17, 2017. ECF No. 22. The Commissioner responded on May 11, 2017. ECF No. 24. Plaintiff filed her Reply on June 6, 2017. ECF No. 25. Having meticulously reviewed the entire record and the parties' briefing, the Court finds that Plaintiff's Motion is well taken and that the Administrative Law Judge's ("ALJ's") ruling should be **REVERSED** and **REMANDED**. Therefore, and for the further reasons articulated below, the Court will **GRANT** Plaintiff's Motion.

## I.    BACKGROUND

Plaintiff was born on September 8, 1971. Administrative R. ("AR") 30. She earned her General Equivalency Diploma ("GED") and attended some college. AR 31. Plaintiff last worked in March 2012 as a clerk at a convenience store. AR 31-32. Prior to her job at a convenience store, Plaintiff worked for SEI at a call center for two and a half years. AR 34.

On March 20, 2012, Plaintiff filed an application for Social Security Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI"), with an alleged disability onset

date of March 6, 2012.  AR 12.  Her claims were denied on September 6, 2012, and upon

reconsideration on June 12, 2013.  AR 12.  Plaintiff filed a written request for hearing on August

12, 2013.  AR 12.  The Administrative Law Judge ("ALJ"), Christopher H. Juge, held a video

hearing on January 13, 2015, at which Plaintiff testified and appeared with counsel in Clovis,

New Mexico.  AR 12.  Todd S. Capielano, a vocational expert, also appeared at the hearing but

did not testify.  AR 12.

On February 25, 2015, the ALJ issued his decision that Plaintiff was not disabled within

the meaning of the Social Security Act ("the Act"), from March 6, 2012, through the date of the

decision.  AR 20.  On April 23, 2015, Plaintiff requested that the Appeals Council review the

ALJ's decision, a request the Appeals Council denied on July 25, 2016.  AR 1-6.  As a

consequence, the ALJ's decision became the final decision of the Commissioner.  20 C.F.R. §

422.210(a) (2017).   Plaintiff timely filed her appeal in this Court on September 22, 2016.  ECF

No. 1.

## II.     PLAINTIFF'S CLAIMS

On appeal, Plaintiff raises three issues.  First, Plaintiff advances a multi-prong argument

that the ALJ erred in concluding that Plaintiff's depression was not disabling.  *See* Pl.'s Mot. 17-

22, ECF No. 22.  Specifically, she asserts that the ALJ omitted certain limitations from her

residual functional capacity ("RFC") determination that had been assigned by Dr. Mark C.

McGaughey, Ph.D, the non-treating consultative psychiatric examiner, and Dr. Howard G.

Atkins, Ph.D, the non-examining state agency medical psychiatric consultant.  *Id.* at 18-19.

Plaintiff also argues that the ALJ erred in evaluating only her anxiety disorder under Listing

12.06, as opposed to evaluating both her anxiety disorder under Listing 12.06 and her affective

disorder under Listing 12.04.  *Id.* at 18.  Plaintiff additionally asserts that the ALJ erred in

granting no weight to the opinion of Christina Wampler, a treating licensed mental health counselor, *id.* at 19, and that the ALJ erred in stating that Plaintiff did not have a history of dedicated mental health treatment. *Id.* According to Plaintiff, the ALJ picked and chose from the record and did not include evidence that contradicted his finding of disability. *Id.* at 20.

Second, Plaintiff argues that the ALJ committed legal error by failing to document the psychiatric review technique ("PRT") in his decision. *Id.* at 21-22. Third, Plaintiff argues that the ALJ committed legal error by applying the Social Security Administration's ("the Administration's") Medical-Vocational Guidelines, otherwise known as "the grids," to determine that Plaintiff was not disabled. *Id.* at 22-26.

## III.    APPLICABLE LAW

### A.    Standard of Review

When the Appeals Council denies a claimant's request for review, the ALJ's decision becomes the final decision of the agency.[1] The Court's review of that final agency decision is both factual and legal. *See Maes v. Astrue*, 522 F.3d 1093, 1096 (10th Cir. 2008) (citing *Hamilton v. Sec'y of Health & Human Servs.*, 961 F.2d 1495, 1497-98 (10th Cir. 1992)) ("The standard of review in a social security appeal is whether the correct legal standards were applied and whether the decision is supported by substantial evidence.")

The factual findings at the administrative level are conclusive "if supported by substantial evidence." 42 U.S.C. § 405(g) (2012). "Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Langley v. Barnhart*, 373 F.3d 1116, 1118 (10th Cir. 2004); *Hamlin v. Barnhart*, 365 F.3d 1208, 1214 (10th Cir. 2004); *Doyal v. Barnhart*, 331 F.3d 758, 760 (10th Cir. 2003). An ALJ's decision "is not based on

---

[1] A court's review is limited to the Commissioner's final decision, 42 U.S.C. § 405(g) (2012), which generally is the ALJ's decision, not the Appeals Council's denial of review. 20 C.F.R. § 404.981 (2017); *O'Dell v. Shalala*, 44 F.3d 855, 858 (10th Cir. 1994).

substantial evidence if it is overwhelmed by other evidence in the record or if there is a mere scintilla of evidence supporting it." *Langley*, 373 F.3d at 1118; *Hamlin*, 365 F.3d at 1214. Substantial evidence does not, however, require a preponderance of the evidence. *See Lax v. Astrue*, 489 F.3d 1080, 1084 (10th Cir. 2007) (citing *Zoltanski v. F.A.A.*, 372 F.3d 1195, 1200 (10th Cir. 2004)). A court should meticulously review the entire record but should neither re-weigh the evidence nor substitute its judgment for that of the Commissioner. *Langley*, 373 F.3d at 1118; *Hamlin*, 365 F.3d at 1214.

As for the review of the ALJ's legal decisions, the Court reviews "whether the ALJ followed the specific rules of law that must be followed in weighing particular types of evidence in disability cases." *Lax*, 489 F.3d at 1084. The Court may reverse and remand if the ALJ failed "to apply the correct legal standards, or to show . . . that she has done so." *Winfrey v. Chater*, 92 F.3d 1017, 1019 (10th Cir. 1996).

Ultimately, if substantial evidence supports the ALJ's findings and the correct legal standards were applied, the Commissioner's decision stands and the plaintiff is not entitled to relief. *Langley*, 373 F.3d at 1118; *Hamlin*, 365 F.3d at 1214, *Doyal*, 331 F.3d at 760.

**B.     Sequential Evaluation Process**

The SSA has devised a five-step sequential evaluation process to determine disability. *See Barnhart v. Thomas*, 540 U.S. 20, 24 (2003); 20 C.F.R. §§ 404.1520(a)(4) (2012). At the first three steps, the ALJ considers the claimant's current work activity, the medical severity of the claimant's impairments, and the requirements of the Listing of Impairments. *See* 20 C.F.R. §§ 404.1520(a)(4); Pt. 404, Subpt. P, App'x 1. If a claimant's impairments are not equal to one of those in the Listing of Impairments, then the ALJ proceeds to the first of three phases of step four and determines the claimant's RFC. *See Winfrey*, 92 F.3d at 1023; 20 C.F.R. §§ 404.1520(e). In

phase two, the ALJ determines the physical and mental demands of the claimant's past relevant work, and in the third phase, compares the claimant's RFC with the functional requirements of his past relevant work to determine if the claimant is still capable of performing her past work. *See Winfrey*, 92 F.3d at 1023; 20 C.F.R. §§ 404.1520(f). If a claimant is not prevented from performing her past work, then she is not disabled. 20 C.F.R. §§ 404.1520(f). The claimant bears the burden of proof on the question of disability for the first four steps. *See Bowen v. Yuckert*, 482 U.S. 137, 146 (1987); *Talbot v. Heckler*, 814 F.2d 1456, 1460 (10th Cir. 1987).

If the claimant cannot return to her past work, then the Commissioner bears the burden at the fifth step of showing that the claimant is nonetheless capable of performing other jobs existing in significant numbers in the national economy. *See Thomas*, 540 U.S. at 24-25; *see also Williams v. Bowen*, 844 F.2d 748, 750-51 (10th Cir. 1988) (discussing the five-step sequential evaluation process in detail).

## IV.    THE ALJ'S DECISION

The ALJ issued his decision on February 25, 2015. AR 20. At step one, he found that Plaintiff met the insured status requirements of the Act through September 30, 2015, and that Plaintiff had not engaged in substantial gainful activity since March 6, 2012, which was the alleged onset date of disability. AR 14. At step two, the ALJ found that Plaintiff had the following severe impairments: asthma, affective disorder, and obesity. AR 14. At step three, the ALJ found that none of Plaintiff's impairments, alone or in combination, met or medically equaled the severity of a listed impairment in 20 C.F.R. Part 404, Subpart P, Appendix 1. AR 15.

In determining that none of Plaintiff's impairments met or medically equaled the severity of a listed impairment, the ALJ considered the following listings: 1.02 (major dysfunction of a

joint)[2], 1.07 (fracture of an upper extremity)[3], 12.06 (anxiety-related disorders)[4], and listings

under Section 6.00 (genitourinary disorders)[5] and 14.00 (immune system)[6].  AR 15.  As

---

[2] Listing 1.02 defines major dysfunction of a joint as "[c]haracterized by gross anatomical deformity (e.g., subluxation, contracture, bony or fibrous ankylosis, instability) and chronic joint pain and stiffness with signs of limitation of motion or other abnormal motion of the affected joint(s), and findings on appropriate medically acceptable imaging of joint space narrowing, bony destruction, or ankylosis of the affected joint(s)" with either "[i]nvolvement of one major peripheral weight-bearing joint (i.e., hip, knee, or ankle), resulting in inability to ambulate effectively" or "[i]nvolvement of one major peripheral joint in each upper extremity (i.e., shoulder, elbow, or wrist-hand), resulting in inability to perform fine and gross movements effectively[.]" 20 C.F.R. § Pt. 404, Subpt. P, App. 1, § 1.02 (2015).

[3] Listing 1.07 defines fracture of an upper extremity as one "with nonunion of a fracture of the shaft of the humerus, radius, or ulna, under continuing surgical management, as defined in 1.00M, directed toward restoration of functional use of the extremity, and such function was not restored or expected to be restored within 12 months of onset." *Id*. § 1.07.

[4] Listing 12.06 defines anxiety-related disorders as disorders for which "anxiety is either the predominant disturbance or it is experienced if the individual attempts to master symptoms; for example, confronting the dreaded object or situation in a phobic disorder or resisting the obsessions or compulsions in obsessive compulsive disorders." *Id*. § 12.06.  When the requirements of both parts A and B are satisfied, or when the requirements in both parts A and C are satisfied, an anxiety disorder meets the required level of severity.  Part A requires "[m]edically documented findings of at least one of the following:
    1. Generalized persistent anxiety accompanied by three out of four of the following signs or symptoms:
        a. Motor tension; or
        b. Autonomic hyperactivity; or
        c. Apprehensive expectation; or
        d. Vigilance and scanning; or
    2. A persistent irrational fear of a specific object, activity, or situation which results in a compelling desire to avoid the dreaded object, activity, or situation; or
    3. Recurrent severe panic attacks manifested by a sudden unpredictable onset of intense apprehension, fear, terror and sense of impending doom occurring on the average of at least once a week; or
    4. Recurrent obsessions or compulsions which are a source of marked distress; or
    5. Recurrent and intrusive recollections of a traumatic experience, which are a source of marked distress[.]"
*Id*.

Part B requires any of the above to result in at least two of the following:
    "1. Marked restriction of activities of daily living; or
    2. Marked difficulties in maintaining social functioning; or
    3. Marked difficulties in maintaining concentration, persistence, or pace; or
    4. Repeated episodes of decompensation, each of extended duration." *Id*.

Part C requires the anxiety disorder to result in "complete inability to function independently outside the area of one's home." *Id*.

[5] Listing 6.00 is used to evaluate "genitourinary disorders resulting in chronic kidney disease (CKD)." *Id*. § 6.00(A).  As the record is devoid of reference to CKD, it is unclear why the ALJ utilized Listing 6.00 in the instant case.

[6] Generally, the Administration evaluates immune system disorders under Listing 14.00 in three categories: autoimmune disorders, immune deficiency disorders excluding human immunodeficiency virus (HIV) infection, and HIV infection.  *Id.* § 14.00(A)(1)(c).  Again, as the record is devoid of reference to an immune disorder of any kind, it is unclear why the ALJ referred to Listing 14.00 in the instant case.

Plaintiff accurately points out in her Motion, the ALJ did not consider Listing 12.04 for affective disorders. Pl.'s Mot. 18. Instead, in justifying his finding at step three, the ALJ wrote only that "the medical evidence does not document listing-level severity, and no acceptable medical source has mentioned findings equivalent in severity to the criteria of any listed impairment[.]" AR 15. The ALJ also noted that the non-examining state disability consultants "also concluded after reviewing the evidence that no listing is met or equaled (see Exhibit 6A)." AR 15.

After finding that none of Plaintiff's impairments satisfied an applicable Listing, the ALJ proceeded to step four and assessed Plaintiff's RFC. AR 15-19. The ALJ found that Plaintiff had the RFC to "perform the full range of simple, unskilled sedentary work as defined in 20 CFR 404.1567(a) and 416.967(a), provided that she avoid concentrated exposure to dust, fumes, and noxious gases." AR 15.

To develop Plaintiff's RFC, the ALJ relied primarily upon Plaintiff's testimony, the reports of the two non-examining state disability consultants (Dr. Leah Holly, D.O., and Dr. Howard G. Atkins, Ph.D.), the report of a consultative psychiatric examiner (Dr. Mark C. McGaughey, Ph.D.), and the ALJ's rejection of licensed mental health counselor Christina Wampler's opinion. The ALJ "considered all [of Plaintiff's] symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence" and "opinion evidence." AR 15. He then concluded that "[h]aving carefully considered the objective medical evidence, such as x-ray reports and clinical findings, there simply is no evidence from any of the claimant's examining physicians supporting a finding that she was disabled during the relevant period or that contradicts the RFC determination." AR 17.

The ALJ also found that Plaintiff was "not entirely credible," which Plaintiff does not challenge on appeal. AR 18. The ALJ found that there were numerous inconsistencies between Plaintiff's testimony and evidence elsewhere in the record. AR 18-19. In particular, the ALJ opined that findings upon examination "repeatedly identified normal sensation and neurological function, and a normal gait" and that physical examinations were "not corroborative of the claimant's allegations of disabling back and foot pain." AR 18. The ALJ noted that although Plaintiff "reported that she had been hospitalized on numerous occasions to treat her acute asthmatic episodes," the record did not support "such frequent hospitalizations as she describes them," and that Plaintiff "can tolerate her own cigarette smoke and marijuana smoke without complications." AR 18-19. According to the ALJ, Plaintiff also testified that she was unable to crouch, yet "went on to testify in response to questions about her mental state that she finds herself crouching in a corner." AR 19.

Specifically regarding Plaintiff's mental impairments, the ALJ compared Plaintiff's testimony with the record, and found that:

> [Plaintiff] does not have a history of dedicated mental health treatment, and only recently (since 8/2014) began to see a social worker for evaluations of mental health symptomatology. (Ex. 7F.) She has never been hospitalized for any mental health disorder, and, aside from being diagnosed with depression, the medical reports, discussed below, are not corroborative of the severe allegations advanced at the hearing.

AR 15.

## A. Opinion evidence

To determine Plaintiff's RFC, the ALJ considered the opinions of Dr. McGaughey, Dr. Holly, Dr. Atkins, and Christina Wampler, Licensed Mental Health Counselor.[7] Although the

---

[7] The record contains three other medical opinions that will not be discussed here. Dr. Erika Garcia, M.D., examined Plaintiff as a consultative examiner, but her opinion is not referred to in the ALJ's decision, and none of the parties refer to it in their briefing. The Court therefore will not review Dr. Garcia's opinion. Dr. Barbara

ALJ did not specifically assign weight to the opinions of Dr. McGaughey, Dr. Holly, and Dr. Atkins, the ALJ adopted them in his decision. On appeal, Plaintiff did not raise the issue of weight assigned to their opinions. With respect to Dr. Holly's opinion that Plaintiff "was capable of performing exertionally light physical activity," the ALJ wrote that he "agrees with that assessment[.]" AR 18. The ALJ also opined that "Dr. McGaughey's assessment was supported by his clinical findings[.]" AR 14. The ALJ did not specifically address Dr. Atkins's findings other than stating that Dr. Atkins "assessed mild restriction in activities of daily living, mild restriction in maintaining social function, and a moderate limitation in concentration, persistence, and pace." AR 14. With respect to the weight granted to Dr. McGaughey's and Dr. Atkins's opinions, the ALJ found that "based on the well-reasoned and fully supported opinions of the state agency consultants, the undersigned finds the claimant no more limited than found herein." AR 15. It is unclear whether the ALJ was also referring to Dr. Holly's opinion in addition to those of Dr. McGaughey and Dr. Atkins.

The ALJ granted no weight to Ms. Wampler's functional assessment of Plaintiff because her conclusions "are not corroborated by contemporaneous treatment notes showing such a severity of symptoms, and are internally inconsistent in so far as the report is dated August 2014,

---

Abercrombie, M.D., a non-examining state disability consultant, assessed Plaintiff's records on August 21, 2012. However, neither the ALJ nor the parties refer to Dr. Abercrombie's physical RFC assessment, and thus the Court will not review Dr. Abercrombie's opinion. Dr. Scott R. Walker, M.D., a non-examining psychiatrist, reviewed Plaintiff's records and completed a Mental RFC assessment of Plaintiff on September 6, 2012. AR 65-66. The ALJ did not refer to Dr. Walker's opinion in his decision. The Court also notes that Dr. Walker's mental RFC is essentially identical to Dr. Atkins's mental RFC, which was mentioned by the ALJ [AR 14-15], including the explanation in narrative form regarding Plaintiff's sustained concentration and persistence limitations. *Compare* AR 65-66 and AR 95-96. The only difference between Dr. Walker's opinion and Dr. Atkins's opinion is that unlike Dr. Walker, Dr. Atkins explicitly referred to the Psychiatric Review Technique ("PRT") in the additional explanation section of his Mental RFC. AR 96. Because the ALJ did not refer to Dr. Walker's opinion in his decision, it is impossible to ascertain whether he considered it in rendering Plaintiff's RFC. Dr. Walker's opinion is also essentially identical to Dr. Atkins's, and because the Court cannot ascertain whether the ALJ took it into account in his decision, it is unnecessary for the Court to refer further to Dr. Walker's opinion.

yet finds the claimant's symptoms to have begun in August 2013, roughly one year before the claimant initiated mental health treatment."[8] AR 19.

*Dr. Mark C. McGaughey, Ph.D.*

Dr. McGaughey is a consultative psychiatric examiner who examined Plaintiff on August 9, 2012. AR 374. Although the ALJ did not specifically assign weight to Dr. McGaughey's opinion, he adopted it. AR 15. Plaintiff reported a history of anxiety and depression, saying that she had increased suicidal thinking and nightmares after being prescribed Lexapro, but even with a change in medication to Seroquel, Paroxetine HCL, and Clonazepam in July 2012, she had not experienced any relief. AR 374. Plaintiff began having suicidal thoughts in July 2012, but denied any intent or plan to carry through with suicide. AR 374.

With respect to substance use, Plaintiff stated she drinks alcohol once a month or less, but admitted that she uses marijuana "in the form of 'one bowl' per day to help deal with her pain." AR 374. Plaintiff told Dr. McGaughey that she smoked four to six cigarettes per day.

Regarding mental status, Dr. McGaughey reported that affect "was generally full range, although [ ] she was tearful at times." AR 375. Plaintiff's mood was moderately dysphoric, and her sleep and appetite were poor most of the time. With respect to attention and concentration, they were "generally okay during the interview[.]" AR 375. Dr. McGaughey reported that Plaintiff's remote memory was grossly intact and her verbal abstract reasoning skills were generally satisfactory. AR 375. Dr. McGaughey also found that her insight and judgment were good, and reaffirmed that Plaintiff denied any suicidal ideation, intent, or plan. AR 375. Clinically, Dr. McGaughey assessed the following diagnostic impressions: depressive disorder,

---

[8] Although the ALJ noted that Ms. Wampler completed her assessment just one month after Plaintiff began treatment with her, the Commissioner clarified in her Response to Plaintiff's Motion that Plaintiff began treatment with Ms. Wampler three months prior to Ms. Wampler's assessment of her. Def.'s Resp. 13, ECF No. 24. The ALJ also referred to Ms. Wampler as a social worker rather than a licensed mental health counselor, the latter of which is her profession and qualification. AR 19.

anxiety disorder, and cannabis abuse.  AR 375.  He also reported a current Global Assessment of

Functioning ("GAF") score of 57.[9]  AR 375.

Dr. McGaughey found that Plaintiff had several mild to moderate limitations secondary

to depression and anxiety:

> Ms. Milner displays mild to moderate limitations in understanding and
> remembering detailed or complex instructions and mild limitations in
> understanding and remembering very short and simple instructions. She displays
> mild to moderate limitations in being able to carry out instructions, to attend and
> concentrate, and to work without supervision. She displays mild to moderate
> limitations in her ability to interact with the public, with co-workers, and with
> supervisors. She displays mild to moderate limitations in her ability to adapt to
> changes in the workplace, to be aware of normal hazards, and to react
> appropriately. She displays mild to moderate limitations in her ability to use
> public transportation or travel to unfamiliar places.

AR 376.

*Dr. Leah Holly, D.O.*

Dr. Holly is a non-examining consultative examiner who reviewed Plaintiff's records on

June 7, 2013.  AR 95.  It is unclear whether the ALJ adopted her opinion, and he did not

specifically assign weight to it.  AR 15.  In the Physical RFC Assessment portion of Dr. Holly's

report, Dr. Holly concluded that Plaintiff had the following exertional limitations: Plaintiff could

occasionally lift or carry 20 pounds; frequently lift or carry 10 pounds; stand and/or walk for six

hours in an eight hour workday; sit with normal breaks for six hours in an eight hour workday;

and Plaintiff has an unlimited capacity to push and/or pull "other than shown, for lift and/or

carry[.]"  AR 93.  Dr. Holly also opined that although Plaintiff had postural limitations, she could

---

[9] The Global Assessment of Functioning test is "widely used for scoring the severity of illness in psychiatry."  *See*
https://www.ncbi.nlm.nih.gov/pmc/articles/PMC2880316/#B14 (last visited January 9, 2018).  A GAF score of 57
indicates "[m]oderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) or moderate
difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)."  *See*
https://msu.edu/course/sw/840/stocks/pack/axisv.pdf (last visited January 9, 2018).

frequently climb ramps, stairs, ladders, ropes, and scaffolds, and had an unlimited capacity to balance, stoop, kneel, crouch, and crawl.  AR 93-94.

Dr. Holly further concluded that while Plaintiff did not have manipulative, visual, or communicative limitations, she did have environmental limitations.  AR 94.  Dr. Holly opined that Plaintiff must avoid even moderate exposure to extreme cold and avoid concentrated exposure to fumes, odors, dusts, gases, and poor ventilation.  AR 94.  As explanation for her environmental limitations, Dr. Holly indicated that although Plaintiff stated that she had been to the Emergency Department of her local hospital because of her asthma, Dr. Holly's review of Plaintiff's medical records indicated that she had actually gone for reasons unrelated to her asthma.  *See* AR 94.

*Dr. Howard Atkins, Ph.D.*

Dr. Atkins is a non-examining consultative examiner who reviewed Plaintiff's records on June 7, 2013.  AR 96.  Although the ALJ did not specifically assign weight to Dr. Atkins's opinion, he adopted it.  AR 15.  In assessing Plaintiff, Dr. Atkins appears to have reviewed Dr. McGaughey's opinion and related medical records from February 2012 to August 2012.  AR 91.  In the "Mental RFC Assessment" portion of Dr. Atkins's report, he opined that Plaintiff did not have understanding and memory limitations, but did have sustained concentration and persistence limitations.  AR 96.  Dr. Atkins rated Plaintiff's sustained concentration and persistence limitations as follows [AR 96]:

Not significantly limited in:

(1) Ability to carry out very short and simple instructions;
(2) Ability to sustain an ordinary routine without special supervision;
(3) Ability to work in coordination with or in proximity to others without being distracted by them; and
(4) Ability to make simple work-related decisions.

Moderately limited in:

(1) Ability to carry out detailed instructions;
(2) Ability to maintain attention and concentration for extended periods;
(3) Ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; and
(4) Ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods.

Dr. Atkins concluded that Plaintiff did not have social interaction limitations or adaptation limitations. AR 96. When asked to "explain in narrative form the sustained concentration and persistence limitations indicated above," Dr. Atkins wrote, "[p]ain, depression and anxiety may cause some limitations in speed and task completion." AR 96. Under "MFRC – Additional Explanation", Dr. Atkins wrote "see PRT." AR 96.

Under the section of the report titled "Psychiatric Review Technique (PRT)," Dr. Atkins identified two listings he used to evaluate Plaintiff: 12.04 for affective disorders and 12.06 for anxiety-related disorders. AR 90. In the PRT section, Dr. Atkins opined that Plaintiff had mild restriction in her activities of daily living ("ADL"); mild difficulties in maintaining social functioning; moderate difficulties in maintaining concentration, persistence or pace; and felt that there was insufficient evidence to conclude that there had been repeated episodes of decompensation. AR 90. Dr. Atkins concluded that Plaintiff's impairments did not satisfy the criteria set forth in the listings. AR 91. Dr. Atkins wrote in the PRT section of his evaluation that Plaintiff "has only recently engaged in psychotropic intervention," and that Plaintiff's "self report of functioning is better than opined by the CE provider and will be taken into account." AR 91. Dr. Atkins further opined that the available evidence "suggests that [Plaintiff] can understand, remember[,] and carry out detailed but not complex instructions, make decisions,

attend[,] and concentrate for two hours at a time, interact adequately with co-workers and supervisors and respond appropriately to changes in a work setting." AR 91.

The Administration's disability determination stated that Plaintiff could not return to her past relevant work because she could stand and walk for only four hours and had moderate limitations in carrying out detailed instructions and in concentrating for an extended period of time. AR 98. Nonetheless, Plaintiff's impairments did not limit her to unskilled work. AR 98. The report concluded that Plaintiff is not disabled, and that there is no evidence of any substance abuse disorder. AR 99.

*Christina Wampler, Licensed Mental Health Counselor*

The ALJ rejected Ms. Wampler's opinion, assigning it no weight. AR 19. Plaintiff began seeing Ms. Wampler for treatment on May 14, 2014. AR 770. Ms. Wampler filled out her assessment form of Plaintiff on August 15, 2014, concluding that Plaintiff had suffered the limitations assessed on the form at their assessed severity since August 26, 2013. AR 768. Ms. Wampler wrote no comments on the form to clarify or otherwise explain her conclusions. AR 769. Treatment notes were attached to Ms. Wampler's opinion, but all of the notes derive from Plaintiff's first appointment on May 14, 2014. AR 770-80.

Ms. Wampler assigned Plaintiff the following limitations:

Mildly limited (defined on the form as "[s]ome problems exist in this area, but generally, the individual would be able to perform this work-related mental function satisfactorily in a work setting on a regular and sustained basis, i.e., 8 hours a day, for 5 days a week, or an equivalent work schedule") [AR 766-67] in the following areas:

   (1) Ability to remember locations and work-like procedures;
   (2) Ability to understand and remember very short and simple instructions; and
   (3) Ability to remember detailed instructions.

Moderately limited (defined on the form as "[t]he individual may be able to perform this work-related mental function on a limited basis in a satisfactory manner, but the individual should not be placed in a job setting where this mental function is *critical* to job performance or to job purpose") [AR 766-68] in the following areas:

> (1) Ability to carry out short and simple instructions;
> (2) Ability to carry out detailed instructions;
> (3) Ability to make simple work-related decisions;
> (4) Ability to interact appropriately with the general public;
> (5) Ability to ask simple questions or request assistance;
> (6) Ability to get along with co-workers or peers without unduly distracting them or exhibiting behavioral extremes;
> (7) Ability to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness;
> (8) Ability to respond appropriately to changes in the work setting;
> (9) Ability to be aware of normal hazards and take appropriate precautions; and
> (10) Ability to travel in unfamiliar places or to use public transportation.

Markedly limited (defined on the form as "[i]n a vocational setting, the individual cannot be expected to function independently, appropriately, and effectively in the designated area on a regular and sustained basis, i.e., 8 hours a day, for 5 days a week, or an equivalent work schedule") [AR 766-68] in the following areas:

> (1) Ability to maintain attention and concentration for extended periods (the approximately 2-hour segments between arrival and first break, lunch, second break, and departure);
> (2) Ability to perform activities within a schedule, maintain regular attendance and be punctual within customary tolerances;
> (3) Ability to sustain an ordinary routine without special supervision;
> (4) Ability to work in coordination with or proximity to others without being unduly distracted by them;
> (5) Ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods;
> (6) Ability to accept instructions and to respond appropriately; and
> (7) Ability to set realistic goals or to make plans independently of others.

**B. Plaintiff's Testimony**

At the hearing, Plaintiff testified that she was born on September 8, 1971, attended school until the eleventh grade but later earned her GED and attended some college, and that she last worked in March 2012. AR 30-31. Plaintiff testified that she was five feet and two inches tall and that she weighed 180 pounds, having gained about 35 pounds in the six months prior to the hearing due to stress and a thyroid condition. AR 32. Plaintiff described her past work history, stating that her last job was as a clerk at a convenience store assisting customers, cleaning and stocking the store, and cooking food. AR 33. Plaintiff held this job from December 2011 to March 2012, but quit because she could not stand or put on tennis shoes because her feet were swollen, and her employer would not allow her to work with a "house shoe" on. AR 33. Plaintiff also testified that she "was having a hard time breathing with everybody coming in with their perfumes," which affected her asthma, causing her to become short of breath, and giving her headaches. AR 33.

Plaintiff also testified that she worked at a call center for two and a half years until her employment was terminated "due to attendance." AR 34. Plaintiff attributed her attendance problems to the fact she was sick, experiencing symptoms from asthma, bronchitis, COPD, and depression, and her sister was gravely ill. AR 35.

With respect to environmental irritants, Plaintiff testified that she is bothered by perfume, dust and other allergens, particularly when it is windy. AR 36. Chemicals used for cleaning, such as bleach, are also irritants. AR 36-37. Plaintiff described the medical issues she had with her right foot, which eventually resulted in the removal of that foot's fifth toe. AR 37-38. Plaintiff testified that this amputation has restricted her to wearing "house shoes" and has caused problems with her balance. AR 38. Plaintiff also described back problems including degenerative disc disease and nerve pain in her legs. AR 39.

Regarding her mental impairments, Plaintiff testified that she had seen physicians who were treating her for depression and anxiety, and they had prescribed medicine to treat those conditions. AR 40-41. Plaintiff further testified that she sees Christina Wampler for counseling. AR 41. With respect to physical functional limitations, Plaintiff testified that she can sit for an hour before needing to change positions, and can stand for 15 to 20 minutes. AR 42. Plaintiff testified to losing her balance sometimes two to three times per day. AR 43. Plaintiff can walk for about 20 minutes at a time. AR 43. Plaintiff described excruciating pain if she walks even part of a city block. AR 44. Plaintiff felt that she can lift less than 10 pounds, and that she cannot stoop, bend, kneel, or crouch due to her back and foot problems. AR 45. Similarly, Plaintiff does not climb ladders due to her balance problems. AR 46.

Plaintiff described side effects of the medications she is taking, including some that cause drowsiness, but some that make her feel like "it's just too much for me" and so she "find[s] herself] crouching in a corner or like in a corner." AR 47-48. Plaintiff smokes cigarettes, and at the time of the hearing was smoking one to two per day (which was decreased from a pack and a half per day) and was trying to quit. AR 49. Plaintiff opined that the reduction in smoking cigarettes did not help her COPD and asthma symptoms because of allergens that trigger her asthma. AR 49-50. Plaintiff uses marijuana, but did not specify during the hearing how much or how often. AR 50.

Plaintiff testified that she has problems with memory because she "forget[s] a lot" and she has difficulty with concentration. AR 51. Plaintiff "lose[s her] train of thought a lot just by talking. . . . [a]ll I know what's in front of me that I can see that I'll remember it if it's in front of me written down. Otherwise I forget a lot." AR 52.

At step four, the ALJ found that Plaintiff had past relevant work at a call center, but that the demands of that position exceeded the RFC. Thus, he found Plaintiff to be unable to perform any past relevant work. AR 19. The ALJ then proceeded to step five, where the ALJ found that "[t]ransferability of job skills is not material to the determination of disability because applying the Medical-Vocational Rules directly supports a finding of "not disabled," whether or not [Plaintiff] has transferable job skills[.]" AR 19. The ALJ then applied the Medical-Vocational Guidelines located at 20 C.F.R. 404, subpart P, appendix 2, finding that "[b]ased on a residual functional capacity for the full range of sedentary work, considering [Plaintiff's] age, education, and work experience, a finding of "not disabled" is directed by Medical-Vocational Rule 201.28." AR 20. By applying the Medical-Vocational Guidelines, the ALJ found that "considering [Plaintiff's] age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that [Plaintiff] can perform[.]" AR 19. Accordingly, the ALJ found that Plaintiff had not been under a disability, as defined by the Act, from March 6, 2012, through February 25, 2015, and denied her claim. AR 20.

## V.    ANALYSIS

While the Court affirms the ALJ's rejection of Ms. Wampler's opinion and rejects Plaintiff's argument that the ALJ should not have applied the grids in light of Plaintiff's obesity and environmental limitations, the ALJ's failure to follow established Tenth Circuit case law and Social Security regulations in determining Plaintiff's RFC requires remand.

Here, the ALJ failed to account in the RFC for the limitations described by Dr. McGaughey and Dr. Atkins, and did not explain his failure to do so. Dr. Atkins's mental RFC assessment is also inconsistent with moderate limitations that he discussed elsewhere in his opinion. This internal inconsistency, and Dr. Atkins's failure to explain it, renders Dr. Atkins's

mental RFC so flawed that the ALJ erred in relying on it when assessing Plaintiff's RFC because it does not constitute substantial evidence.[10]  Plaintiff's RFC, therefore, is not supported by substantial evidence.

The ALJ also failed to document the application of the Psychiatric Review Technique, which Social Security regulations require him to do.  As a result, this Court must reverse and remand.

**A.    Plaintiff's RFC is not supported by substantial evidence.**

**1.    Dr. Atkins's mental RFC assessment is so flawed that it does not comprise substantial evidence supporting Plaintiff's RFC.**

To determine Plaintiff's RFC, the ALJ relied primarily upon the opinions of Dr. McGaughey and Dr. Atkins, both of which he deemed to be "well-reasoned and fully supported[.]"  AR 15.  The ALJ also reviewed Plaintiff's testimony [AR 16-17], Plaintiff's medical records [AR 17-18], Dr. Holly's opinion [AR 18], and Ms. Wampler's opinion [AR 19]. Plaintiff's argument that the ALJ impermissibly picked and chose from the record to determine the RFC focuses primarily upon the ALJ's statement that Plaintiff "does not have a history of dedicated mental health treatment" [AR 15] and that Plaintiff did not initiate mental health treatment until July 2014 [*see* AR 19].  *See* Pl.'s Mot 17-21.

---

[10] In order to guide the ALJ upon remand, even if Dr. Atkins's mental RFC was substantial evidence supporting the ALJ's RFC determination, the Court also would have found that the ALJ erred in relying solely on Dr. Atkins's moderate limitation in concentration, persistence, and pace, which was a limitation developed as part of the Psychiatric Review Technique ("PRT").  *Lull v. Colvin*, 525 F. App'x 683, 685-86 (10th Cir. 2013) (unpublished) (differentiating between the PRT, which is used to assess the severity of mental impairments, and the Mental Residual Functional Capacity Assessment ("MRFCA"), which evaluates mental functions relevant to vocational determinations, and concluding that the ALJ did not err by including MRFCA limitations in the plaintiff's RFC); *Beasley v. Colvin*, 520 F. App'x 748, 754 (10th Cir. 2013) (unpublished) (emphasizing that the adjudicator is to use limitations developed as part of the PRT to assess an impairment's severity, that PRT limitations are not part of the RFC assessment, and that an ALJ was not required to include PRT limitations in the plaintiff's RFC in part because the PRT limitation may not translate to a work-related functional limitation).  The ALJ referred to Dr. Atkins's assessment of moderate limitation in the area of concentration, persistence, and pace, which was determined as part of the PRT, to assess Plaintiff's impairments' severity, but the ALJ did not discuss Dr. Atkins's other moderate limitations, which were determined to aid Dr. Atkins in rendering Plaintiff's mental RFC.  *See* AR 14-15, 91-96.

Despite the parties' failure to brief this issue, the Court finds that Dr. Atkins's opinion was not well-reasoned, nor was it fully supported. In fact, it was so flawed, and written in a manner that deviates so substantially from regulations and the Administration's Program Operations Manual System ("POMS"), that Dr. Atkins's mental RFC assessment does not comprise substantial evidence in support of the ALJ's RFC assessment.

To discuss the shortcomings of Dr. Atkins's opinion, the Court must first provide an overview of the structure of a non-examining agency psychologist's opinion, the instructions the Administration gives to the provider who fills out the form for their opinion, and what the different purposes are for each section of the opinion.

At the administrative initial and reconsideration stages of an individual's disability claim, with respect to evaluation of medical evidence, a medical consultant ("MC") and psychological consultant ("PC") evaluate the evidence in a case to determine if it is adequate to show disability, and review requests for consultative examiners ("CEs") to ensure that they are necessary. *See* POMS § 24501.001(B)(3)(a). The MC and PC also determine the severity of a plaintiff's impairments, determine whether any impairments meet or equal the requirements of a Listing at step three in the sequential evaluation process, and assess and determine the plaintiff's RFC. *See id.* § 24501.001(B)(3)(c)-(d). Every claim receives a disability determination from the agency at the initial and reconsideration stages, and every disability determination must contain a medical evaluation. *Id.* § 24501.002(A). A medical evaluation must address all allegations of disability that a plaintiff makes, address all medically determinable impairments, discuss signs, symptoms, and laboratory findings, and contain an analysis of the medical evidence and how it was used in the evaluation. *Id.* § 24501.002(B)(2)(a).

To document the evaluation, MCs and PCs complete the medical evaluation on medical assessment forms in the electronic Claims Analysis Tool ("eCAT"). *Id.* § 24501.002(c). These forms include, among others, the Psychiatric Review Technique, the Physical Residual Functional Capacity Assessment, the Mental Residual Functional Capacity Assessment (Form SSA-4734-F4-SUP), and the Medical Evaluation. *Id.* As its name suggests, the Mental RFC Assessment form is used by a PC in evaluating and documenting a plaintiff's mental RFC. *Id.* § 24510.060(A)(1). The Mental RFC Assessment form is divided into four sections: (1) Heading; (2) Section I, Summary Conclusions; (3) Section II, Remarks; and (4) Section III, Functional Capacity Assessment and MC Signature. *Id.* § 24510.050(B). According to both the agency and the Tenth Circuit, "Section I is merely a worksheet to aid in deciding the presence and degree of functional limitations and the adequacy of documentation and does not constitute the RFC assessment." *Id.* § 24510.060(B)(2); *see Smith v. Colvin*, 821 F.3d 1264, 1269 n.2 (10th Cir. 2016) ("Dr. Frommelt's notations of moderate limitations served only as an aid to her assessment of [RFC]. We compare the [ALJ's] findings to Dr. Frommelt's opinion on [RFC], not her notations of moderate limitations."). Section II provides an opportunity for the PC to discuss the evidence needed to rate the limitations in Section I. POMS § 24510.060(B)(3). Section III is where the mental RFC assessment should be recorded, "*explaining the conclusions indicated in section I*, in terms of the extent to which these mental capacities or functions could or could not be performed in work settings." *Id.* § 24510.060(B)(4) (emphasis added).

To complete Section I, the PC should check the box for "moderately limited" "when the evidence supports the conclusion that the individual's capacity to perform the activity is impaired." *Id.* § 24510.063(B)(2). Instructions explicitly state that "[t]he degree and extent of the capacity or limitation *must be described* in narrative format *in Section III*." *Id.* (emphasis

added). To complete Section III, the consultant is asked to "prepare a *narrative statement* for *each* of the subsections . . . in section I." *Id.* § 24510.065(A). Further, the MC is to "*discuss* the *functions* that the individual has demonstrated that he/she can do, as well as any *limitations* of those functions." *Id*. § 24510.065(B)(1). The consultant is told to "*describe*, in detail, the mental capacities, limitations, and any other information that is important in the comprehensive expression of mental RFC." *Id.* Agency POMS instructions make clear that Section III *cannot* ignore conclusions in Section I. On the contrary, the PC is to describe any limitations in narrative format that he or she found in Section I.

Not only did Dr. Atkins fail to follow the clearly prescribed instructions for assessing Plaintiff's mental RFC, but his failure rendered his mental RFC assessment so suspect that it could not have constituted substantial evidence in support of the ALJ's RFC determination. In this case, Dr. Atkins assessed Plaintiff's moderate limitations in Section I. AR 96. However, he did not explain those moderate limitations, except that he noted, "[p]ain, depression[,] and anxiety may cause some limitations in speed and task completion." AR 96. For Section III, Dr. Atkins wrote only "see PRT[.]" AR 96. This alone creates problems. The POMS clearly instructed Dr. Atkins not to do that. Furthermore, limitations that are determined as part of the PRT are not to be considered as limitations with respect to a plaintiff's mental RFC. *See supra* p. 19 n. 10. In so doing, Dr. Atkins haphazardly conflated different types of evaluations of Plaintiff's mental impairments that are used at different stages of the sequential evaluation process.

To worsen matters, Dr. Atkins did not explain in Section III any of the moderate limitations that he found in Section I, and then rendered a mental RFC that *directly contradicted* the moderate limitations he noted in Section I. Dr. Atkins wrote in the PRT, which he converted

into Section III of the Mental RFC Assessment form, that "[t]he available [Evidence of Record] suggests that the claimant can understand, remember and carry out detailed but not complex instructions, make decisions, attend and concentrate for two hours at a time, interact adequately with co-workers and supervisors[,] and respond appropriately to changes in a work setting."  AR 91.  This mental RFC is entirely inconsistent with the moderate limitations he described in Section I.  Dr. Atkins found that Plaintiff was moderately limited in her ability to carry out detailed instructions, yet concluded in Plaintiff's mental RFC that Plaintiff can remember and carry out detailed instructions.  AR 92, 96.  Dr. Atkins found in Section I that Plaintiff was moderately limited in her ability to maintain attention and concentration for extended periods, yet concluded in Plaintiff's mental RFC that Plaintiff can nevertheless attend and concentrate for two hours at a time.  AR 92, 96.  These two conclusions are consistent only if the Court finds that an "extended period" is longer than two hours, which none of the parties ask the Court to do, and which the Court lacks any evidence from the record to do.  Section III cannot ignore Section I, yet Dr. Atkins's Section III is entirely inconsistent with his Section I.

In the Court's view, the internal inconsistency of Dr. Atkins's opinion means that his opinion cannot be substantial evidence that supports the ALJ's assessment of Plaintiff's RFC.  "Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Langley*, 373 F.3d at 1118; *Hamlin*, 365 F.3d at 1214; *Doyal*, 331 F.3d at 760.  The Court cannot conclude that Dr. Atkins's mental RFC assessment can be accepted by a reasonable mind as adequate to support the ALJ's RFC assessment.  Dr. Atkins found that Plaintiff had moderate limitations, yet did not discuss them, and rendered a mental RFC that assumed those limitations did not exist.  The ALJ erred by relying on Dr. Atkins's flawed, internally inconsistent mental RFC in determining Plaintiff's RFC.

## 2.    The ALJ erred by not accounting for Plaintiff's moderate limitations in her RFC.

Plaintiff's RFC – that she can perform the full range of unskilled, sedentary work and must avoid concentrated exposure to dust, fumes, and noxious gases – contains no limitations related to her mental impairments.  *See* AR 15.  This omission is material because Dr. McGaughey and Dr. Atkins both opined that Plaintiff had functional limitations due to her mental impairments, yet the ALJ did not account for *any* of them in Plaintiff's RFC.  Because the ALJ did not account for Plaintiff's moderate non-exertional limitations that are not otherwise permitted to be accounted for in a limitation to a specific type of work (like unskilled work), the RFC is not supported by substantial evidence.

In arguing that the ALJ erred by failing to incorporate Plaintiff's moderate limitations into her RFC, Plaintiff highlights that "a moderate impairment is not the same as no impairment at all."  Pl.'s Mot. 19 (quoting *Haga*, 482 F.3d at 1208).  Plaintiff asserts that the ALJ picked and chose evidence from the record that supported a finding of non-disability, while ignoring evidence that supports Plaintiff's claim of disability.  *See* Pl.'s Mot. 20.

The Commissioner argues that the ALJ's limitation of Plaintiff to unskilled work takes into account Dr. McGaughey's moderate limitations.  Def.'s Resp. 8-9.  The Commissioner also argues that Dr. Atkins's moderate limitations were in the worksheet portion of the Mental RFC form rather than the narrative portion, only the latter of which is to be relied upon for the examiner's assessment.  *Id.* at 10-11.

The Court agrees with Plaintiff for the reasons that follow.

### a.    Standard for evaluating medical evidence

An ALJ must evaluate every medical opinion in the record, although the weight given to each opinion will vary according to the relationship between the disability claimant and the

medical professional.  *Hamlin,* 365 F.3d at 1215.  *See Robinson v. Barnhart*, 366 F.3d 1078, 1084 (10th Cir. 2004) ("[t]he opinion of an examining physician is generally entitled to less weight than that of a treating physician, and the opinion of an agency physician who has never seen the claimant is entitled to the least weight of all."); *Victory v. Barnhart,* 121 F. App'x 819, 825 (10th Cir. 2005) (unpublished) (finding it is clear legal error to ignore a medical opinion); 20 C.F.R. § 404.1527(c) (2017)[11].  Regulations identify several factors an ALJ must consider in evaluating a medical opinion.  *See* 20 C.F.R. § 404.1527(c)(1)-(6).

"[T]here is no requirement in the regulations for a direct correspondence between an RFC finding and a specific medical opinion on [a specific] functional capacity . . . because the ALJ, not a physician, is charged with determining a claimant's RFC from the medical record."  *Chapo v. Astrue,* 682 F.3d 1285, 1288 (10th Cir. 2012) (alteration and internal quotation marks omitted)).  Nevertheless, "[a]n ALJ is not entitled to pick and choose through an uncontradicted medical opinion, taking only the parts that are favorable to a finding of nondisability."  *Id.* at 1292 (internal brackets omitted) (quoting *Haga*, 482 F.3d at 1208).  It is reversible error for the ALJ not to discuss uncontroverted evidence he chooses not to rely on, as well as significantly probative evidence he rejects.  *Grogan v. Barnhart,* 399 F.3d 1257, 1266 (10th Cir. 2005).

### b.     The ALJ impermissibly picked and chose from Dr. McGaughey's and Dr. Atkins's opinions.

In 2007, the Tenth Circuit published two cases that control here.  First, in *Haga*, the court held that an ALJ erred in failing to explain why he adopted some of a consultative examiner's restrictions but rejected others.  *See* 482 F.3d at 1208.  The court remanded "so that the ALJ

---

[11] The Court cites only to the regulations for DIB claims, which are in Part 404 of Title 20 of the Code of Federal Regulations.  The Court does not cite to the parallel regulations for SSI claims, Part 416 of the same title.  In addition, the parties do not cite to Part 416 in their briefing.  Plaintiff stated in her Motion that all of her citations were to Part 404, and acknowledged that there are parallel regulations in Part 416.  Pl.'s Mot. 2, ECF No. 22.  The Commissioner did not address the two different bodies of regulations.

[could] explain the evidentiary support for his RFC determination." *Id.* Later in 2007, the Tenth Circuit expressly applied *Haga* and its reasoning to the opinions of nonexamining physicians in *Frantz v. Astrue*, 509 F.3d 1299, 1302–03 (10th Cir. 2007). *Haga*'s holding that an "ALJ is not entitled to pick and choose through an uncontradicted medical opinion, taking only the parts that are favorable to a finding of nondisability" has become known as the "pick and choose" rule. 482 F.3d at 1208.

More recent decisions of the Tenth Circuit have clarified the application of *Haga*, but none have overruled it. First, in 2015, the Tenth Circuit held it is not always necessary for the ALJ to make specific limitations in the RFC for concentration, persistence and pace. *Vigil v. Colvin*, 805 F.3d 1199, 1203-04 (10th Cir. 2015). In *Vigil*, the Tenth Circuit concluded that the ALJ adequately accounted for moderate limitations in concentration, persistence and pace by limiting the plaintiff to unskilled work. *Id.* The plaintiff in *Vigil* had impaired delayed recall, inability to spell in reverse, and could not recall the President's name, leading the ALJ to conclude that the plaintiff "could not be expected to perform complex tasks." *Id.* at 1203. *Vigil* noted that unskilled work generally requires only the following: (1) understanding, remembering, and carrying out simple instructions; (2) making judgments that are commensurate with the functions of unskilled work – *i.e.*, simple work-related decisions; (3) responding appropriately to supervision, co-workers and usual work situations; and (4) dealing with changes in a routine work setting. *Id.* at 1204 (quoting SSR 96-9p, 1996 WL 374185, at *9 (July 2, 1996)).

In 2016, the Tenth Circuit ratified *Vigil*'s holding that "an administrative law judge can account for moderate limitations by limiting the claimant to particular kinds of work activity." *Smith v. Colvin*, 821 F.3d 1264, 1269 (10th Cir. 2016) (citing *Vigil*, 805 F.3d at 1204). In *Smith*, the Tenth Circuit reviewed an ALJ's RFC determination based on a non-examining physician's

assessment of nine moderate non-exertional limitations. *Id.* at 1268. These nine limitations were: (1) maintaining concentration, persistence, and pace; (2) remaining attentive and keep concentration for extended periods; (3) working with others without getting distracted; (4) completing a normal workday and workweek without interruption for psychologically based systems; (5) performing at a consistent pace without excessive rest periods; (6) accepting instructions and respond appropriately to criticism by supervisors; (7) getting along with coworkers or peers without distracting them or engaging in behavioral extremes; (8) responding appropriately to changes in the workplace; and (9) setting realistic goals or engaging in independent planning. *Id.* In her RFC narrative, the non-examining physician omitted the majority of the nine limitations and recommended instead that the claimant "could (1) engage in work that was limited in complexity and (2) manage social interactions that were not frequent or prolonged." *Id.* The ALJ adopted the recommendation and found that the claimant "(1) could not engage in face-to-face contact with the public and (2) could engage in only simple, repetitive, and routine tasks." *Id.* at 1269. "Through these findings," the Tenth Circuit held, "the [ALJ] incorporated the functional limitations of [the claimant's] moderate nonexertional limitations." *Id.* *Smith* reasoned that the "notations of moderate limitations served only to aid [the physician's] assessment of residual functional capacity." *Id.* at 1269, n.2. Correspondingly, the Tenth Circuit explained that the court's function is not to compare the ALJ's findings to a physician's "notations of moderate limitations," but rather to compare the ALJ's findings to the physician's opinion. *Id.*

Here, the ALJ reviewed three psychiatric medical opinions, each of which recommended non-exertional limitations. While the ALJ rejected Christina Wampler's opinion, which this Court affirms, *infra* pp. 31-33, the ALJ did not reject Dr. McGaughey's opinion or Dr. Atkins's

opinion.  Dr. McGaughey found that Plaintiff had mild to moderate limitations in understanding and remembering detailed or complex instructions, and mild to moderate limitations in being able to carry out instructions [AR 376], and Dr. Atkins found that Plaintiff was moderately limited in her ability to carry out detailed instructions [AR 96].  Both concluded that Plaintiff was mildly to moderately limited (Dr. McGaughey) and moderately limited (Dr. Atkins) in her ability to maintain attention and concentration.  AR 96, 376.  Dr. McGaughey also opined that Plaintiff had mild to moderate limitations in being able to work without supervision [AR 376], although Dr. Atkins felt she was not significantly limited in that regard.  AR 96.  Dr. McGaughey found that Plaintiff was mildly to moderately limited in her ability to interact with the public, with co-workers, and with supervisors.  AR 376.  Dr. Atkins did not address that particular limitation, but did find that Plaintiff's ability to complete a normal work day and work week without interruptions from psychologically based symptoms was moderately limited.  AR 96.  Dr. Atkins also concluded that Plaintiff was moderately limited in her ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances.  AR 96.  Dr. McGaughey opined that Plaintiff was mildly to moderately limited in her ability to adapt to changes in the workplace, to be aware of normal hazards, and to react appropriately [AR 376], although Dr. Atkins did not agree.  AR 96.

Neither *Vigil* nor *Smith* addressed moderate limitations in understanding and remembering detailed or complex instructions, which both Dr. McGaughey and Dr. Atkins opined are moderate limitations that Plaintiff has.  AR 96, 376.  Neither *Vigil* nor *Smith* addressed moderate limitations in ability to interact with the public, be aware of normal hazards, and to work without supervision, which are mild to moderate limitations Dr. McGaughey ascribed to Plaintiff.  AR 96.  Last, neither *Vigil* nor *Smith* addressed moderate limitations in

28

ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances, which are limitations Dr. Atkins concluded Plaintiff has. None of these limitations are otherwise assumed in unskilled work. *See Vigil*, 805 F.3d at 1204. The ALJ, therefore, cannot collapse these limitations in Plaintiff's RFC into a single type of work – in this case, sedentary, unskilled work – in order to implicitly account for them.

The Court next turns to the Commissioner's argument [Def.'s Resp. 10-11] that Dr. Atkins's moderate limitations were contained within the *worksheet* portion of his mental RFC form (Section I), as opposed to the *narrative* portion of it (Section III), and thus did not need to be accounted for in the RFC. As the Court explained *supra* pp. 19-23, Dr. Atkins should have explained in Section III the moderate limitations he found in Section I. His failure to do so, and the fact that his mental RFC assessment concluded the *opposite* of the Section I limitations, meant that the ALJ should not have relied upon Dr. Atkins's mental RFC assessment because it was not substantial evidence. The government's argument is essentially that the ALJ was free to rely just on Section III of Dr. Atkins's opinion (his mental RFC assessment), even though that section was severely flawed, to the exclusion of Section I of Dr. Atkins's opinion, which Dr. Atkins was required to account for in Section III. The Court does not agree. The Court concludes that the ALJ therefore should instead have accounted for Dr. Atkins's moderate limitations of Plaintiff in carrying out detailed instructions, performing activities within a schedule, maintaining regular attendance, and being punctual within customary tolerances either by rejecting them and explaining that rejection, or by adopting them in the RFC. *See* AR 96. Furthermore, the Commissioner's argument does not apply to the mild to moderate limitations described by Dr. McGaughey, which the ALJ does not address apart from acknowledging that they exist. AR 15.

The ALJ here made no effort to resolve any of the conflicts between Dr. McGaughey and Dr. Atkins regarding their assessed limitations of Plaintiff, and yet adopted their opinions in full. *See* AR 15. The ALJ also adopted their opinions in full while ignoring their limitations when he determined Plaintiff's RFC, which was simply that she could perform the full range of unskilled, sedentary work as long as she avoided concentrated exposure to dust, fumes, and noxious gases. AR 15. The Commissioner asserts that the limitation to unskilled work somehow both explains the differences in opinion between Dr. Atkins and Dr. McGaughey and accounts for the limitations that both consultants identified. Def.'s Resp. 8-9. However, the Tenth Circuit warned in *Vigil* that "[t]here may be cases in which an ALJ's limitation to 'unskilled' work does not adequately address a claimant's mental limitations." 805 F.3d at 1204 (citing *Chapo*, 682 F.3d at 1290 n.3 (recognizing that restrictions to unskilled jobs do not in all instances account for the effects of mental impairments)). This is one of those cases.

It is possible to argue that the ALJ's RFC here does not run afoul of *Vigil*, *Smith*, or *Haga* because Dr. Atkins concluded that Plaintiff's limitations were all in the area of concentration, persistence, and pace, and *Vigil* held it is not always necessary for the ALJ to make specific limitations in the RFC for concentration, persistence and pace. 805 F.3d at 1203-04. In *Vigil*, however, the ALJ explained his reasoning regarding the RFC, pointing to evidence that the plaintiff had some problems with concentration, persistence, and pace such that he could not be expected to perform complex tasks, but also pointing to evidence that the plaintiff retained enough memory and concentration to perform simple tasks. *Id.* at 1203-04. Here, the ALJ did not explain his RFC in similarly specific terms, much less explain why he believed that limiting Plaintiff to unskilled work accounted for the mild to moderate limitations set forth by Dr. McGaughey and Dr. Atkins.

In *Haga*, the ALJ "failed to explain his reasons for rejecting some of [the consultative examiner's] restrictions, while implicitly adopting others." 482 F.3d at 1207. Here, the ALJ simply rejected all of Dr. McGaughey's and Dr. Atkins's restrictions, without explanation, while simultaneously adopting their opinions. And in *Smith*, unlike here, the ALJ accounted in some way for the plaintiff's moderate limitations *in addition* to limiting the plaintiff to unskilled work. 821 F.3d at 1269 ("The [ALJ] arrived at a similar assessment, concluding that [the plaintiff] (1) could not engage in face-to-face contact with the public and (2) could engage in only simple, repetitive, and routine tasks. Through these findings, the [ALJ] incorporated the functional limitations of [the plaintiff's] moderate nonexertional impairments."). Here, Plaintiff's RFC had no limitations other than to a certain type of work – in this case, unskilled sedentary work – and to avoid concentrated exposure to environmental irritants. AR 15. It is the lack of adequate explanation here, in addition to the failure to account for the limitations set forth by both Dr. McGaughey and Dr. Atkins, whose opinions the ALJ otherwise forthrightly accepted, that requires remand.

**B.      The ALJ's rejection of Christina Wampler's opinion is supported by substantial evidence.**

The ALJ's rejection of Ms. Wampler's opinion is supported by substantial evidence despite several factual errors strewn throughout his analysis of her opinion. The ALJ determined that Ms. Wampler's conclusions were "not corroborated by contemporaneous treatment notes showing such a severity of symptoms[,]" a determination with which this Court agrees. AR 19. It is entirely unclear how Ms. Wampler determined her limitations, or how she knew what Plaintiff's symptoms were prior to treatment apart from Plaintiff's own recounting of them, which the ALJ discredited because he found Plaintiff only partially credible. Although the ALJ erroneously stated that Plaintiff had started seeing Ms. Wampler only one month before Ms.

Wampler completed her assessment [AR 19], Plaintiff had actually started seeing Ms. Wampler three months before Ms. Wampler filled out the assessment. AR 770-80. Nonetheless, the ALJ was permitted to take into account the length of the treating relationship in according no weight to Ms. Wampler's opinion. *See* 20 C.F.R. 404.1527(c) (2017)[12] (discussing factors in deciding the weight an ALJ gives to a medical opinion, one of which is the length of the treatment relationship and the frequency of the examination). Indeed, the Administration's regulation concerning the evaluation of opinion evidence states, "Generally, the longer a treating source has treated you and the more times you have been seen by a treating source, the more weight we will give to the source's medical opinion." *Id.* In this case, Ms. Wampler had seen Plaintiff only twice before issuing her fairly restrictive assessment. The only notes attached in support of her report, which itself had no explanation for the conclusions reached therein, were from Plaintiff's first appointment in May 2014. AR 766-80.

The ALJ also wrote that Ms. Wampler's opinion was "internally inconsistent in so far as the report is dated August 2014, yet finds [Plaintiff's] symptoms to have begun in August 2013, roughly one year before [Plaintiff] initiated mental health treatment." AR 19. It is clear that Plaintiff sought help for mental health symptoms long before she started seeing Ms. Wampler in May 2014. AR 402 (Plaintiff complained on March 28, 2012, of anxiety and was crying during her appointment), AR 408 (Plaintiff complained on July 23, 2012, of depression symptoms), AR 378 (Plaintiff followed up on September 24, 2012 for depression, stating she still felt anxiety and was quick to anger). However, the ALJ is correct that Ms. Wampler's opinion is internally inconsistent in that she states that Plaintiff's symptoms have been at their assessed severity since

---

[12] 20 C.F.R. § 404.1527 set forth guidelines for the evaluation of opinion evidence for claims filed before March 27, 2017, as the instant claim was. For the evaluation of opinion evidence for claims filed on or after March 27, 2017, 20 C.F.R. § 404.1520c applies. The version of 20 C.F.R. § 404.1527(c) that was in effect on the date that Plaintiff filed her claim is identical to the most recent version of that portion of the regulation. *See* 20 C.F.R. § 404.1527(d) (2012).

August 2013, yet Ms. Wampler did not start seeing Plaintiff until May 2014, and there is nothing in Ms. Wampler's notes to explain how she knew that Plaintiff's symptoms were at their assessed severity in August 2013. *See* AR 766-70.

While the ALJ made three factual errors in his evaluation of Ms. Wampler's opinion, those factual errors amount to harmless error. *See Jones v. Berryhill*, No. 17-1107, slip op. at 3 (10th Cir. Dec. 21, 2017) ("To deem an error harmless in the social-security context, we must be able to say with confidence that 'no reasonable administrative factfinder, following the correct analysis, could have resolved the factual matter in any other way.'") (quoting *Allen v. Barnhart*, 357 F.3d 1140, 1145 (10th Cir. 2004)). Even if the ALJ had understood that Plaintiff had begun seeing Ms. Wampler three months before Ms. Wampler filled out her assessment form, as opposed to only one month, Plaintiff had still only seen Ms. Wampler twice when Ms. Wampler filled out the assessment form. Ms. Wampler's opinion was also still inconsistent internally, even if it is not true that Plaintiff did not initiate mental health treatment until May 2014. Finally, although the ALJ referred to Ms. Wampler as a social worker in his decision, while she is actually a licensed mental health counselor, the ALJ adequately explained and documented the numerous shortcomings of her opinion. AR 19. It is therefore difficult for the Court to say with confidence that a reasonable administrative fact finder would have granted Ms. Wampler's opinion weight even if that fact finder was aware that she was a licensed mental health counselor, as opposed to a social worker. *See Allen*, 357 F.3d at 1145. Therefore the ALJ's errors in evaluating Ms. Wampler's opinion are harmless, and the Court affirms the ALJ's rejection of Ms. Wampler's opinion as supported by substantial evidence.

### C.    Plaintiff's obesity and environmental limitations did not preclude the ALJ's application of the grids to determine whether she is disabled.

Plaintiff argued that the ALJ committed legal error by applying the grids to determine that Plaintiff was not disabled. Pl's Mot. 22-26. The Commissioner responded by asserting that the grids encompass work that does not involve concentrated exposure to dust, fumes, and odors, primarily because most job environments do not involve concentrated exposure to those irritants. *See* Def.'s Resp. 15-16. The Commissioner distinguished the cases Plaintiff cited in support of her argument by pointing out that those cases involved plaintiffs that were entirely precluded from exposure to environmental irritants. *See id.* at 16. The Commissioner also asserts that the ALJ took into account Plaintiff's obesity by limiting her to sedentary work. *Id.* at 17.

The Court is not persuaded by Plaintiff's argument. While non-exertional impairments preclude reliance on the grids only to the extent that those impairments limit the range of jobs available to the plaintiff, *Gossett v. Bowen*, 862 F.2d 802, 807-08 (10th Cir. 1988), Plaintiff did not point to any evidence in the record showing that the environmental restrictions and her obesity limited the range of jobs available to her. Plaintiff argued only that the ALJ's finding that Plaintiff's obesity was severe precluded the ALJ from applying the grids.[13] *See* Pl.'s Mot. 24-26. That argument is not sufficient for this Court to reverse the ALJ on this issue. The Court also is persuaded by the Commissioner's argument that the environmental limitations in Plaintiff's RFC do not preclude application of the grids. *See* Pl.'s Resp. 15-16. Additionally, the Court notes that Plaintiff's argument that the ALJ should have obtained vocational expert testimony was raised for the first time in her Reply, and is thus not addressed by the Court. See Pl.'s Reply 8. The Court accordingly concludes that the ALJ's application of the grids was not precluded by Plaintiff's environmental limitations and obesity.

### D. The ALJ erred by failing to document application of the Psychiatric Review Technique in his decision.

---

[13] Whether the Court's decision would have been different if Plaintiff had identified depression as a non-exertional impairment that makes application of the grids inappropriate is a more difficult question the Court need not decide.

Plaintiff asserts that the ALJ is required by regulation to document application of the Psychiatric Review Technique ("PRT") in his decision. Pl.'s Mot. 21-22, citing 20 C.F.R. § 404.1520a (2017). The Commissioner attempts to dispense with this argument through a footnote, claiming that this argument "exalts form over substance" and that failure to document application of the technique amounts to harmless error. Def.'s Resp. 14. Plaintiff did not again address this argument in her Reply.

Section 404.1520a requires the ALJ to evaluate the plaintiff's symptoms, signs, and laboratory findings and to rate the degree of functional limitation in four enumerated areas (activities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation). 20 C.F.R. § 404.1520a (2011)[14]. The first three functional areas are to be evaluated using a five-point scale from none to extreme, and the last functional area (episodes of decompensation) is to be evaluated using a four-point scale from none to four or more. *Id.* The ALJ is then required to determine the severity of the plaintiff's mental impairments. If the plaintiff's mental impairment is severe, as the ALJ found Plaintiff's affective disorder to be in this case [AR 14], the ALJ must determine whether it meets or is equivalent in severity to a listed mental disorder. *Id.* If the severe mental disorder does not meet or is not equivalent to a listing, then the ALJ is to assess the plaintiff's RFC. *Id.* The regulation explicitly requires the ALJ to "document application of the technique in the decision." *Id.* Specifically, the ALJ:

> must incorporate the pertinent findings and conclusions based on the technique. The decision must show the significant history, including examination and laboratory findings, and the functional limitations that were considered in reaching a conclusion about the severity of the mental impairment(s). The

---

[14] Section 404.1520a was amended on January 16, 2017, to change the four functional areas that the ALJ assesses and to change the evaluation scale for episodes of decompensation, which was one of the four functional areas. The version in effect at the time the ALJ rendered his decision was last amended in September 2016, but that amendment did not alter the content of the regulation to which this opinion refers. Between the regulation's amendments in May 2011 and September 2016, the content of the regulation was the same as that which appears in this opinion.

decision must include a specific finding as to the degree of limitation in each of the functional areas described in paragraph (c) of this section.

*Id.*

Here, the ALJ merely summarized Dr. Atkins's findings regarding the first three functional areas (mild restriction in activities of daily living, mild restriction in maintaining social function, and moderate limitation in concentration, persistence, and pace), and pointed out that Plaintiff had never been hospitalized for any mental health disorder. AR 14-15. Dr. Atkins does not explain how he reached these conclusions, and the ALJ felt it sufficient to simply summarize Dr. Atkins's conclusions without also tying them to evidence in the record. Neither Dr. Atkins nor the ALJ discussed Dr. McGaughey's findings regarding Plaintiff's activities of daily living, and how those findings were either consistent or inconsistent with Dr. Atkins's findings. *See* AR 90-91, 374-75. The ALJ did not include a specific finding as to the degree of limitation in each of the four functional areas; he merely summarized Dr. Atkins's findings. AR 14-15. The ALJ did refer to Dr. McGaughey's findings that Plaintiff did not suffer from delusions, hallucination, or psychosis; that she had good judgment and insight; and that she had grossly intact remote memory with satisfactory reasoning skills and a GAF score of 57. AR 15. However, this is nothing more than a recapitulation of what Dr. McGaughey wrote in his report. AR 375. The ALJ did not then relate Dr. McGaughey's findings to rating the four functional areas, nor did he compare them with Dr. Atkins's findings or attempt to provide any explanation or support for Dr. Atkins's ratings of the four functional areas. *See* AR 14-15.

The Commissioner directs the Court to *Thompson v. Colvin*, 551 F. App'x 944, 946-47 (10th Cir. 2014) (unpublished), and *Rose v. Colvin*, 634 F. App'x 632, 636 (10th Cir. 2015) (unpublished), in support of her argument that failure to document the PRT is harmless error. This reliance is misplaced. In *Thompson*, the Tenth Circuit concluded that failure to document

application of the PRT in the ALJ's decision was harmless error because elsewhere the ALJ established that the plaintiff's mental impairments were not disabling. *See id.* *Thompson* pointed out that the ALJ recognized the plaintiff's mild and moderate limitations, and "formulated an RFC that took these limitations into account by restricting her to jobs requiring simple, repetitive and routine tasks and limited contact with the general public, co-workers and supervisors." *See id.* at 947 (internal quotation marks and punctuation omitted). Similarly, in *Rose*, the ALJ limited the plaintiff to unskilled work, with additional limitations that she needed to work in "a relatively isolated environment with limited contact with peers and supervisors and the general public," which was consistent with the findings of five medical opinions in the case. 634 Fed. App'x. at 636.

Here, as discussed *supra* pp. 24-31, the ALJ neither took Plaintiff's limitations into account in crafting the RFC, nor explained why. This error, which distinguishes the instant case from *Thompson* and *Rose*, combined with the fact that the ALJ did not evaluate Plaintiff's depression under Listing 12.04 (*see* Pl.'s Mot. 18)[15], means that the ALJ's failure to document application of the PRT was not harmless error. On remand, the ALJ is instructed to document application of the PRT in his decision.

## VI. CONCLUSION

The Court affirms the ALJ's rejection of Christina Wampler's opinion as supported by substantial evidence and affirms the ALJ's application of the grids as not precluded by Plaintiff's non-exertional limitations of obesity and environmental limitations. However, the Court finds

---

[15] The Court does not further address this argument. Plaintiff did not additionally brief this argument, nor did Plaintiff connect this argument with the argument that the ALJ failed to properly document application of the PRT. The Psychiatric Review Technique ("PRT") requires the ALJ to evaluate the plaintiff's mental impairments by using the listings, which this ALJ did not do since this ALJ did not evaluate Plaintiff's depression under Listing 12.04. However, because the Court has concluded that it was not harmless error for the ALJ to fail to document application of the PRT, the Court need not additionally conclude that the ALJ erred by failing to evaluate Plaintiff's depression under Listing 12.04.

that the ALJ's RFC was not supported by substantial evidence because he failed to adequately explain why he ostensibly accepted Dr. McGaughey's opinion and Dr. Atkins's opinion but rejected the mild to moderate limitations enumerated within both opinions. The ALJ also failed to account for those limitations within Plaintiff's RFC, and failed to resolve the conflicts between Dr. McGaughey's opinion and Dr. Atkins's opinion with respect to the same. Those errors were compounded by the ALJ's failure to properly document the application of the PRT, which he is required to do by regulation.

**IT IS THEREFORE ORDERED** that Plaintiff's "Motion to Reverse or Remand the Administrative Decision" [ECF No. 22] is **GRANTED.**

**IT IS FURTHER ORDERED** that the Commissioner's final decision is **REVERSED** and that the instant cause is **REMANDED** for further review consistent with this opinion.

**IT IS SO ORDERED.**

THE HONORABLE GREGORY J. FOURATT
UNITED STATES MAGISTRATE JUDGE
*Presiding by Consent*